[Civ. No. 35004. Second Dist., Div. Four. June 8, 1970.]

UNION CENTRAL LIFE INSURANCE COMPANY, Plaintiff, v. KARLA G. PEPE, Defendant and Appellant; MAVIS C. JANSSEN, Defendant and Respondent.

## COUNSEL

James Murray for Defendant and Appellant.

A. J. Weiss for Defendant and Respondent.

No appearance for Plaintiff.

## OPINION

IRWIN, J.*—This action was instituted by Union Central Life Insurance Co., Inc. in interpleader to determine who is entitled to the proceeds of an insurance policy. These funds have been deposited with the court and said plaintiff is no longer a party. Defendant Karla G. Pepe appeals from that portion of the judgment in favor of defendant Mavis C. Janssen.

We refer to an opinion in a prior appeal of this case reported as *Union Central Life Insurance Co.* v. *Janssen* (1968) 260 Cal.App.2d 518 [67 Cal.Rptr. 253]. Therein the Court of Appeal reversed a summary judgment and held, in effect, that a trial was necessary to find "the ultimate facts which will decide this controversy." Thereafter, the case went to trial and the court, with appropriate findings, determined that Mavis was the named beneficiary of the insurance policy, but concluded that the proceeds were divisible between the two defendants, as community property of the assured and his surviving spouse Karla. Judgment was entered accordingly. There is no question concerning the community property phase of the judgment.

 Defendant now argues on this appeal that the judgment is contrary to the facts and the law. The Honorable Ellsworth Meyer, the trial judge, prepared and filed a memorandum opinion which sets forth the facts, contentions and applicable law. Since this opinion ably expresses our

---

*Retired judge of the superior court sitting under assignment by the Acting Chairman of the Judicial Council.

views in regard to the issues presented, we adopt the same with appropriate deletions as follows:

"For clarity, the deceased, the former wife and the widow herein, will be referred to by their given names, Raymond, Mavis and Karla, respectively.

"There is no conflict in the evidence as to the following facts:

*February 28, 1955,* Raymond and Mavis executed a property settlement agreement, including terms as to alimony and child support (exh. E); Raymond was then conducting a business known as G.M.P. Automatic Equipment Corporation;

*April 11, 1955,* an interlocutory judgment of divorce was entered (exh. E);

*April 20, 1956,* Raymond, now an executive employee of James B. Lansing Sound, Inc., executed an 'Enrollment Card for Group Insurance' issued by Occidental Life Insurance Company of California, he designated Mavis as the beneficiary (exh. 2);

*May 9, 1956,* a final judgment of divorce in favor of Mavis was entered (exhs. 6 and E);

*January 7, 1961,* Raymond and Karla were married; no change of beneficiary was ever filed with Occidental;

*June 23, 1961,* negotiations between Lansing Sound and The Union Central Life Insurance Company looking toward the substitution of a group policy with the latter to replace the policy with Occidental culminated in the purchase thereof by Lansing, Union Central agreeing to accept the copies of Occidental enrollment cards in Lansing Sound's possession; Lansing Sound paid the premium and delivered the copies of the enrollment cards;

*July 14, 1961,* the Union Central policy was issued effective retroactively as of June 23, 1961;

*July 19, 1961,* the Occidental policy was cancelled;

*August 11, 1961,* certificate number 64, covering Raymond, in the amount of $50,000.00 and naming 'Mavis C. Pepe, wife' as the beneficiary (exh. 4) was issued and transmitted;

*September 27, 1961,* Lansing Sound delivered the certificates to its employees with a four page letter (exh. A); no change of beneficiary was filed by Raymond with Union Central or delivered to Lansing Sound or any other person;

*August 16, 1964,* Raymond, age 52, died.

"The evidence further shows that after the death of Raymond, Messrs. Thomas and Edwards of Lansing Sound and a secretary used a tool to open his desk and the certificate was found therein with other papers. Karla was not present, the certificate was delivered to her by her father and she forwarded it to Union Central.

"The words 'Mavis C. Pepe, wife' on the certificate have been erased, but are discernable. 'Karla G. Pepe, Wife' has been typed slightly above the erasure.

"As to a beneficiary, certificate number sixty-four provides on its first page under a bold face caption, 'DEATH BENEFIT' the following: 'If the insured dies, the amount then due will be paid to the beneficiary designated by him. The Group Policy provides that if no beneficiary was designated or if no designated beneficiary is living and there is no specific provision for payment in that event, the amount will be paid to the deceased's spouse, if living, otherwise . . .' On the second page, under a bold face caption, 'CHANGE OF BENEFICIARY' it is stated: 'The Group Policy provides that the insured has the right on his sole signature to designate a beneficiary . . . and to change the beneficiary or method of settlement at any time and from time to time by written notice in form acceptable to the Company.' The two quotations above (except for the word, 'then') appear in section E-2 of the policy. The evidence shows that Raymond received the certificate but is silent as to whether he saw the policy.

"Testimony was given by Forsch that Albritton, the broker representing Lansing, prior to an award to Union Central, asked whether Union Central would accept copies of the Occidental enrollment cards instead of requiring new enrollment cards, due to the fact that labor negotiations were under way and the principal difference between the existing and proposed policy was that the amount of insurance on six executives would be increased from $20,000.00 to $50,000.00 and on 'ten second level executives' from $10,000.00 to $20,000.00. After receiving approval from the home office, Forsch advised Albritton the answer was affirmative. Albritton, described by Lansing Sound officers as the 'agent' and the 'insurance advisor' of the corporation testified substantially the same.

"As Union Central was selling and Lansing Sound buying and paying for the policy, no reason appears why they could not have designated the beneficiary for each employee absolutely except, perhaps, for unhappy employer-employee relations. It follows they could adopt such course as they agreed upon for the designation of beneficiaries. The carrier waived its usual practice of having its own enrollment card signed by each insured and used

signed copies of an almost identical card which disclosed the current beneficiary of each insured under a group policy currently in effect.

"The Union Central policy, however, did not limit the designation of beneficiaries to one class or freeze the designation, but provided: 'E2. The insured has the right on his sole signature to designate a beneficiary . . . and to change the beneficiary . . . at any time and from time to time by written notice in form acceptable to the Company.' Paragraph C4 provided: 'OWNERSHIP. The Policyholder is the owner of this Group Policy and may agree with the Company to any change in or amendment of the policy without the consent of any person whose life is insured or of any beneficiary. No change in or amendment of the policy, however, may affect in any way the right to change the beneficiary . . .'

"Paragraph E2, above, should not be interpreted to mean that if an employee did not sign a *Union Central* enrollment card no beneficiary was designated, rather it confers upon the insured the right to designate a beneficiary and to change the beneficiary whenever and as often as he desired. The phrase that he may do so 'on his sole signature' is nothing more than a statement that he may do so without the consent of the policyholder or his spouse. In not requiring the signature of a spouse, it merely follows the rule stated in *Tyre* v. *Aetna Life Ins. Co.,* 54 Cal.2d 399 [6 Cal. Rptr. 13, 353 P.2d 725].

"The agreement to use the copies of the Occidental cards was a 'practical interpretation' of the policy requirements by the two contracting parties which the courts should accept. (*Crestview Cemetery Assn.* v. *Dieden,* 54 Cal.2d 744, 752 [8 Cal.Rptr. 427, 356 P.2d 171].)

"In inaugurating the policy by using the Occidental cards Union Central and Lansing Sound did not deprive Raymond of any right. The purchase of this coverage was added compensation to him for his services and he was given the right to change the beneficiary immediately if he so desired. It did not deprive Karla of any right because she like Raymond, had no right as to the policy until the date it came into existence and thereafter Raymond had the exclusive right to designate the beneficiary. (C.C. 172 [now Civ. Code, § 5125]; *Tyre* v. *Aetna Life Ins. Co., supra.*)

"As noted above, Raymond had the right 'to change the beneficiary . . . by written notice in form acceptable to the Company.' The evidence shows that Raymond never gave any written (or oral) notice to Union Central of a desire to change the beneficiary.

"To the general rule that the method of changing the beneficiary specified in the policy must be substantially followed three relaxations of the rule are recognized when the contest is only between claimants to the proceeds. They were set out in *Pimentel* v. *Conselho Supremo, etc.,*

6 Cal.2d 182 [57 P.2d 131], as: (1) when the carrier has waived its own rules and, pursuant to the request of the insured, issued a new certificate, (2) it was beyond the power of the insured to literally comply with the formalities and (3) the insured has pursued the course set out in the policy and has done all in his power to change the beneficiary, but before the new certificate is actually issued he dies. It was held that if (2) or (3) above is true, 'a court of equity will treat such certificate as having been made.' In *Cook* v. *Cook,* 17 Cal.2d 639 [111 P.2d 322], the plaintiff unsuccessfully claimed the proceeds under a provision in the will of the deceased insured, the defendant being the named beneficiary. The court noted the above decision and held at pages 648 and 649: 'However, as a general principle, the method prescribed by the policy must be followed, and if it is not, no change is accomplished, unless whatever occurred in that respect comes within one or more of the three exceptions to the rule . . . Even if the will when made in 1925 should be considered as an attempt to change the beneficiary or assign the policy at that time rather than on the date of decedent's death when the will became operative, still the case would not fall within any of the exceptions because no endeavor was made to communicate such change to the insurer . . .'

■ "In the present case, as noted above, Raymond named Mavis as a beneficiary of the Occidental policy thirteen months and fourteen days after the execution of the property settlement (which provided that all insurance on his life was and his after-acquired property would be his separate property) and a year and nine days after the entry of the interlocutory judgment of divorce. Cognizance must also be taken of the fact that during the six months and twelve days between his marriage to Karla and the cancellation of the Occidental policy, Raymond took no action to change the named beneficiary on that policy.

"The evidence is that when Union Central transmitted the policy or certificates, it transmitted a supply of forms which could be used by insureds to change beneficiaries named on the certificates.

"Cognizance must also be taken of these facts: Raymond was a vice-president and director of Lansing, was acquainted with Albritton, stated to Albritton, 'I understand my insurance is being increased' and that during the two years, eleven months and twenty days from the receipt of certificate number sixty-four to his death he did not communicate any desire to change the beneficiary to Union Central or Albritton or any other person.

"No evidence was presented as to the identity of the person who erased the name of Mavis as a beneficiary and typed in the name of Karla, although the evidence does show that the certificate passed through the hands

of at least three persons between the time it was removed from Raymond's desk until it was sent to Union Central. It is true that Mr. Edwards, called on behalf of Karla, testified that he took the certificate out of Raymond's desk, that he saw Karla's name on it, that he delivered the certificate to Karla. Another witness testified that in January 1965, Mr. Edwards had stated that he had not read the name of the beneficiary which was on the certificate. Exhibit 5 tends to support the contradiction.

"Whether the erasure and retyping was done by Raymond or some other person does not affect the result herein. If performed by Raymond, the act would stand alone herein and would not fall in any of the three relaxations recognized as exceptions to the rule requiring compliance with the terms of the policy. The result does not depend upon whether Mavis or Karla is said to have the burden of proof or each has as to her contentions.

"The court must find from the whole of the evidence that the erasure and retyping was not performed by Raymond.

"As noted above, Raymond was married to Karla some months prior to the effective date of this policy. . . ."

The judgment is affirmed.

Kingsley, Acting P. J., and Dunn, J., concurred.

A petition for a rehearing was denied June 24, 1970, and appellant's petition for a hearing by the Supreme Court was denied August 5, 1970.